AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Sean Rafferty, being a duly sworn and appointed Special Agent of the United States Immigration and Customs Enforcement (ICE), formerly known as the Immigration and Naturalization Service (INS), and the United States Customs Service (USCS) hereby make the following statement:

1. I am currently employed as a Special Agent with ICE and have been so employed since December 2002. I have had training and experience in the enforcement of the Immigration and Nationality laws of the United States and I am fully familiar with the statutes applicable to false document production, possession and transfer as well as false claims to United States Citizenship.

2. This affidavit is based upon my own investigation and information provided to me by other law enforcement agents and agencies. This affidavit is not intended to contain all information I have learned during the course of this investigation but that which is sufficient to support a finding of probable cause in support of an application for a criminal complaint charging Luz MARTINEZ-Lebron aka Leslie Muniz aka "La Rubia", ("MARTINEZ"), Jose ZAITER-Pou ("ZAITER") and Ricky BAEZ-Cruz aka Ricky Acevedo-Melo ("BAEZ") with a violation of 8 U.S.C. 1324(a)(1)(A)(v)(I), conspiracy to commit a crime under 8 U.S.C. 1324(a)(1)(A)(iii) (knowingly concealing or harboring an illegal alien).[1]

---

[1] The relevant portion of 18 U.S.C. Section 1324 (a) (1) (A) (iii) provides that "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

3. On June 18, 2010, ICE confidential informant, SA-754-BO ("CI"), contacted me concerning a Dominican female that goes by the name of "La Rubia", later identified as MARTINEZ. Ruben LNU ("Ruben") told CI about MARTINEZ. MARTINEZ is assisting Dominican nationals, who were previously deported, to have their fingerprints altered for a fee of $4,500 U.S. dollars. These individuals are smuggled back into the United States and arrange with "La Rubia" to have their fingerprints altered to avoid detection by law enforcement.

4. On June 18, 2010, at approximately 6:24 p.m., CI conducted a consensually monitored three way telephone call with MARTINEZ at telephone number (781) 484-7480 and Ruben at 781-244-0787. Prior to placing the telephone call, a recording device was activated by SA Rafferty to provide additional evidence of the telephone call. During the conversation MARTINEZ asked CI if he/she had his/her fingerprints done before. CI stated he/she hadn't and that he/she was sent to the Dominican Republic and it was very difficult to get back into the United States.

5. MARTINEZ told CI that her ex-husband, later identified as BAEZ, who was deported, had his fingerprints altered. MARTINEZ said the doctor, later identified as ZAITER, did it in Santo Domingo because he has a clinic in Santo Domingo. MARTINEZ stated the doctor comes here from time to time and he does it to people who cannot travel to the Dominican Republic. MARTINEZ further stated that when BAEZ was coming from Santo Domingo he was arrested by Immigration in Texas. She said BAEZ spent two months incarcerated and was given bail because the authorities could not find anything in his record because nothing matched his fingerprints. MARTINEZ said if something came up, he would have been sent back or he could have had to do a

few years before he would have been deported again. MARTINEZ further stated that the doctor did it to her "Campadre" (godfather). MARTINEZ stated her "Compadre" was arrested and nothing old showed with his fingerprints.

6. CI asked MARTINEZ how much it will cost. MARTINEZ stated the doctor is charging $4,500 U.S. Dollars. CI asked MARTINEZ to tell him how it is done. MARTINEZ stated that they operate in the middle of your finger and take the middle part out. She said the doctor is a licensed doctor and will give you anesthesia so you don't feel anything. The doctor will put stitches in and in ten days he will come back and remove the stitches. He gives you antibiotics and pain relievers.

7. MARTINEZ stated the doctor would be here for one to two more weeks. MARTINEZ stated that the doctor told her if she has someone who is going to do it then he would stay a bit longer. CI stated that he/she would like to sit down with the doctor, so the doctor could explain it to him. CI further stated that he/she has three people for sure to have it done but if it doesn't hurt, he/she could have five people that want it done. MARTINEZ stated the doctor is very cautious and doesn't like a lot of people to know or to be there. MARTINEZ told CI that he/she can't tell anyone. Only people getting this done will go. CI said the people he/she would be taking are his/her brother, brother in law and my two nephews.

8. On June 23, 2010, at approximately 2:04 p.m., confidential informant SA-754-BO conducted a consensually monitored telephone call to MARTINEZ at telephone number (781) 484-7480. Prior to placing the telephone call, a recording device was activated by SA Rafferty to provide additional evidence of the telephone call. During the conversation CI told MARTINEZ that he was calling with good and bad news and which news did she

want to hear first. CI told MARTINEZ the bad news is that he/she can't meet tomorrow because his/her two nephews left from "El Patio" (slang for Dominican Republic) and are in Guatemala and will enter the United States around the 3rd of July. CI told MARTINEZ that because they were also deported, he/she wants them to all get their fingerprints altered together. MARTINEZ said she would tell the doctor and call CI back.

9. On June 23, 2010, at approximately 3:29 p.m., CI conducted a consensually monitored telephone call to MARTINEZ at telephone number (781) 484-7480. Prior to placing the telephone call, a recording device was activated by SA Rafferty to provide additional evidence of the telephone call. During the conversation MARTINEZ said she spoke with the doctor about what CI had said earlier and the doctor said he can't stay too long because he already has been here a month and a half. The doctor said he spent the money he has made here and has some engagements in Santo Domingo. The doctor would like for CI to do it now because right now he is living off what he made here. CI told MARTINEZ to tell the doctor that he can't leave Florida until the guys arrive here from the border, because they are all driving together to Massachusetts. MARTINEZ said that was okay, but a lot people say yes and then they don't follow through. CI stated if he/she wasn't going to do anything he/she wouldn't have reported to MARTINEZ to tell her that he wasn't going to make it. MARTINEZ said she understood and that the doctor understands but the doctor said there was a guy who said he was going to do it. The doctor extended his time and he has engagements in Santo Domingo and he is going to lose the ones in Santo Domingo for waiting for the people here. CI told MARTINEZ to explain it to the doctor and call CI back.

10. On July 1, 2010, at approximately 9:26 p.m., CI conducted a consensually monitored telephone call to MARTINEZ at telephone number (781) 484-7480. Prior to placing the telephone call a recording device was activated by SA Rafferty to provide additional evidence of the telephone call. During the conversation CI told MARTINEZ that his/her nephews crossed yesterday and that he/she is leaving tomorrow to get them. MARTINEZ said that the doctor called two days ago and she told him that CI was waiting for the other guys. CI said tomorrow morning he is going to leave and pick them up. CI stated he will be arriving Monday or Tuesday and we will do it on Wednesday. MARTINEZ said she would tell the doctor.

11. On July 7, 2010, MARTINEZ, ZAITER and BAEZ arrived at the Red Roof Inn, 19 Commerce Way, Woburn, MA and met with CI. ZAITER had a surgical bag with him containing antibiotics, anesthesia, surgical blades, gauze pads, stitching kits, a head light, surgical glasses and syringes.

12. MARTINEZ asked CI where the other guys were and CI said they were in another room. CI told MARTINEZ that he wanted to make sure everything was okay first. ZAITER asked CI if he wanted to see someone who has had their fingerprints altered. BAEZ showed his hands to CI. BAEZ showed CI that his fingerprints had previously been altered by ZAITER. ZAITER explained the procedure to CI. ZAITER explained how his procedure will create new fingerprint with no traces of your old ones. CI stated that if he/she gets caught he/she is going to get a "home run" (Dominican slang for going to jail and getting deported). CI stated that he can't take a chance unless it is certain. BAEZ stated that he was previously deported and when he came back through Texas, he was caught again and given bail because nothing came up with his new

fingerprints. ZAITER stated that in 10 days CI would get the stitches out. CI gave $4,500 U.S. dollars to MARTINEZ. MARTINEZ asked BAEZ to count the money. BAEZ started counting the money and asked CI where the other guys were. CI stated that he was going to get them. At that time, ICE Special Agents entered the room and arrested MARTINEZ, ZAITER and BAEZ.

Based upon the foregoing facts, I believe there is probable cause to believe and do believe that Luz MARTINEZ-Lebron aka Leslie Muniz aka "La Rubia", Jose ZAITER-Pou and Ricky BAEZ-Cruz aka Ricky Acevedo-Melo, during and in relation to a felony or felonies enumerated in subsection v of Section 1324 (a) (1) (A) conspiring to, knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceal, harbor, or shield such alien from detection.

*Sean Rafferty*
Sean Rafferty
Special Agent
Immigration and Customs
Enforcement

Sworn to and subscribed before me this 8th day of July, 2010.

UNITED STATES MAGISTRATE JUDGE